**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PAUL MORINVILLE, *et al.*,

      Plaintiffs,

     v.

UNITED STATES PATENT AND
TRADEMARK OFFICE,

      Defendant.

Case No. 19-cv-1779-CKK-MJS

## <u>MEMORANDUM ORDER</u>

Plaintiffs Paul Morinville and Gilbert Hyatt claim that the U.S. Patent and Trademark Office's ("PTO") past use of a Sensitive Application Warning System ("SAWS") violated the Privacy Act as to two putative classes. At its simplest, SAWS functioned by flagging certain "sensitive" patent applications for further review, without necessarily notifying applicants. Relevant here, PTO has maintained throughout this case that SAWS was in use from 1994 to 2015, and no later. But with discovery now complete and Plaintiffs' motion for class certification still pending, new information from the U.S. Department of Justice ("DOJ") caused Plaintiffs to question that proposition. In June 2025, Edward R. Martin, Jr.—the United States Pardon Attorney and, at the time, Director of DOJ's "Weaponization Working Group"—sent a letter to the then-acting PTO Director concerning a PTO initiative that functioned in more recent years as a "restarted" SAWS program, at least according to the letter. Plaintiffs, seizing on that description and similar accompanying statements in the DOJ letter, now seek to reopen discovery to learn more about the referenced program. (ECF No. 77.) PTO opposes the motion, insisting that the DOJ

1

letter clumsily described a review program that bears little similarity to SAWS. Because Plaintiffs

have shown good cause to reopen discovery in limited part, the Court **GRANTS** the motion.[1]

## BACKGROUND

Judge Kollar-Kotelly ably described Plaintiffs' claims in her prior ruling. *See Morinville v.

United States Pat. & Trademark Off.*, 442 F. Supp. 3d 286 (D.D.C. 2020). The Court repeats here

only what is relevant to resolve the current discovery motion.

Paul Morinville and Gilbert Hyatt are both inventors whose patent applications were

subject to the SAWS program. Broadly speaking, Plaintiffs allege that "[u]nder SAWS, PTO

personnel flagged sensitive applications" based on various criteria, including the "possibility for

publicity, old effective filing dates with broad-scope patents, or objectionable or derogatory subject

matter." *Id.* at 290. Plaintiffs additionally claim that, for certain SAWS-flagged applications, PTO

"would prepare a SAWS report" that would "identify[] the factual basis for the flag" to facilitate

further review. *Id.* PTO generally did not disclose to applicants the fact of any SAWS flags or

reports. Believing SAWS caused adverse consequences to them and others, Plaintiffs brought a

putative class action alleging that SAWS violated various provisions of the Privacy Act.

After Judge Kollar-Kotelly ruled that most of Plaintiffs' claims could proceed past the

motion-to-dismiss stage, the parties completed discovery. Plaintiffs then moved for class

certification, and that motion remains pending (through a referral to the undersigned).

Enter the current dispute. From the outset of this case, PTO has staunchly maintained that

it shut down the SAWS program in 2015. (*See, e.g.*, ECF No. 9, PTO's Original Mot. to Dismiss

---

[1] The referral order suggested that the undersigned issue a report and recommendation (*see* Min. Order, Mar. 2, 2026), presumably based on the stated relation to the earlier referral on Plaintiffs' motion for class certification, which requires an R&R. But because the instant motion implicates a non-dispositive matter, this ruling takes the form of an order rather than an R&R. *See* 28 U.S.C. § 636(b)(1)(A); LCvR 72.2(a).

at 21 (asserting that SAWS was "retired in 2015"); ECF No. 66, PTO's Opp'n to Class Cert. at 12 (arguing that "the SAWS program was ended nearly a decade ago"); ECF No. 79, PTO's Opp'n to Mot. to Reopen Discovery ("Opp'n") at 3 (stating that SAWS was "retired over a decade ago").)

On September 24, 2025, Bloomberg Law published an article titled, *DOJ 'Weaponization' Leader Sought Info on Patent Office Program*. (ECF No. 77-1, Pls.' Ex. E at 21–24.)[2] The article focused on a letter penned by Ed Martin—United States Pardon Attorney, Associate Deputy Attorney General, and then-Director of the DOJ's "Weaponization Working Group"—to then-Acting PTO Director Coke Morgan Stewart concerning a "new Sensitive Application Warning System program." (*See id.*; ECF No. 77-1, Pls.' Ex. F at 25–27.)[3] Invoking his official capacity as "Associate Deputy United States Attorney General," Mr. Martin thanked Mr. Stewart for discovering what he described as a "Biden-era directive to secretly flag pending patents and allowable patent applications and claims to prevent them from issuing"—"SAWS activity" that the letter described as "illegal" and "unconstitutional." (*Id.*, Pls.' Ex. F at 26–27.) Mr. Martin went on to request documents associated with Mr. Stewart's discovery of "the new Sensitive Application Warning System (SAWS) program, restarted in 2021 under President Joe Biden." (*Id.*) And the letter tied this "restarted" program, at least in some sense, to the prior "SAWS program that operated from 1994 until it was 'retired' in 2015." (*Id.*)

Based on that reporting, Plaintiffs' counsel promptly contacted PTO's counsel to request a copy of the letter. (ECF No. 77, Mot. to Reopen Discovery ("Mot.") at 4.) PTO was unable to

---

[2] Michael Shapiro, *DOJ 'Weaponization' Leader Sought Info on Patent Office Program*, Bloomberg Law, (Sept. 24, 2025, 6:05 AM), https://perma.cc/R897-TMPW.

[3] Mr. Martin's letter itself was later published by a different news outlet. *See* Gene Quinn, *Prosecution Laches Is Illegitimate—And SAWS Proves It*, IP WatchDog (Nov. 18, 2025, 3:15 PM), https://perma.cc/3WTN-7VW7 (citing *DOJ to USPTO*, IP WatchDog (Jun. 23, 2025), https://perma.cc/2UCJ-NLUY).

immediately engage because of the government shutdown that unfolded in late 2025. (*Id.*) But PTO eventually responded in early December 2025. (*Id.*) PTO took the position that Mr. Martin's letter was "based on a misapprehension of how patents quality review programs work" and inaccurately described the program as a "restarted" SAWS. (ECF No. 77-1, Pls.' Ex. C at 12–15.) Unassuaged, Plaintiffs now move to reopen discovery to "allow limited discovery on the 'restarted' SAWS program discussed in [the DOJ] letter." (*See* Mot. at 1.)

PTO opposes the motion. (ECF No. 79 ("Opp'n").) With their opposition, PTO submitted a declaration from Dr. Kathleen Bragdon, Deputy Director for the PTO's Office of Patent Quality Assurance, who was deposed earlier in this case. (ECF No. 79-1, Bragdon Decl.) Dr. Bragdon's declaration attempts to explain that the review initiative referenced in Mr. Martin's letter—what she calls "Large Patent Family Review"—is meaningfully different from the SAWS program at the center of this litigation. Dr. Bragdon asserts that "[a]lthough SAWS and Large Patent Family Review both featured flagging applications … these review initiatives were not the same." (*Id.* ¶ 20.) The declaration walks through how Large Patent Family Review functioned (*id.* ¶¶ 9–18), states that none of Plaintiffs' applications were subject to this review (*id.* ¶ 18), and articulates a variety of asserted differences between SAWS and Large Patent Family Review (*id.* ¶¶ 19–26). Of these differences, Dr. Bragdon highlights that SAWS selection criteria were "somewhat subjective," while Large Patent Family Review used "an objective standard" based on a threshold number of patents within a family. (*Id.* ¶ 21.) She also emphasizes that applications in Large Patent Family Review were generally only flagged for two weeks, as opposed to the "weeks, months, or, in some extreme cases, even years" that some applications were flagged by SAWS. (*Id.* ¶ 23.)

Amid these two disparate descriptions of the PTO review program referenced in the DOJ letter—Mr. Martin's characterization of a "restarted" SAWS program that he described as "illegal"

and "unconstitutional," versus Dr. Bragdon's description of a separate initiative that bears little resemblance to the prior SAWS program—the parties are at an impasse as to whether any new discovery on this topic is justified. The matter is fully briefed and referred to the undersigned for decision. (*See* ECF No. 81 ("Reply"); Min. Order, Mar. 2, 2026.)

## LEGAL STANDARD

A scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4); *see* LCvR 16.4. This "good cause standard requires the 'party seeking relief to show that [a scheduling order's] deadlines cannot reasonably be met despite [its] diligence.'" *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 226 (D.C. Cir. 2011) (quoting *S&W Enters., LLC v. SouthTrust Bank*, 315 F.3d 533, 535 (5th Cir. 2003)); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.* (*Rail Freight II*), 138 F. Supp. 3d 1, 2 (D.D.C. 2015) ("Reopening discovery … requires a showing of good cause.") (cleaned up). In evaluating good cause, courts consider six factors: "whether trial is imminent; whether the request is opposed; whether the non-moving party would be prejudiced; whether the moving party was diligent in obtaining discovery within the guidelines established by the court; the foreseeability of the need for additional discovery in light of the time allotted by the district court; and the likelihood that the discovery will lead to relevant evidence." *Rail Freight II*, 138 F. Supp. 3d at 2 (quoting *Watt v. All Clear Bus. Sols., LLC*, 840 F. Supp. 2d 324, 326 (D.D.C. 2012)) (numbering omitted). Reopening discovery "is committed to the sound discretion of the trial court." *Watt*, 840 F. Supp. 2d at 326 (quoting *Childers v. Slater*, 197 F.R.D. 185, 187 (D.D.C. 2000)).

## ANALYSIS

The first two factors are straightforward and not in dispute here: trial is not imminent, and PTO opposes the request. (*See* Mot. at 8; Opp'n at 12.) So only the last four factors require any real discussion. Because the parties start with diligence, the Court begins its analysis there, too.

***Diligence***. The moving party's diligence in pursuing the discovery at issue is often framed as one of the most important factors in the "good cause" analysis. *United States v. Kellogg Brown & Root Servs., Inc.*, 285 F.R.D. 133, 136 (D.D.C. 2012) ("The primary factor in determining whether good cause exists is the diligence of the party seeking discovery before the deadline.") (citing *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 609 (9th Cir. 1992)).

Here, as a starting point, there is no disagreement that Plaintiffs diligently pursued this new discovery after learning about the DOJ letter at the center of the dispute. (*See* Mot. at 5 ("[O]nce information about the 'restarted' SAWS program arose, Plaintiffs immediately sought for the PTO to voluntarily reopen discovery to provide this material."); Opp'n at 14 ("PTO does not contest Plaintiffs' diligence in the time frame between learning about the letter and filing their motion[.]").) That is an important facet of the backdrop here, as the Court would certainly look more dimly on Plaintiffs' request if they had dragged their feet in raising this new issue with PTO or the Court. But this factor "primarily considers the diligence of the party in seeking discovery before the deadline." *Lopez v. Timeco Inc.*, 291 F. Supp. 3d 1, 3 (D.D.C. 2017) (quoting *Barnes v. Dist. of Columbia*, 289 F.R.D. 1, 7 (D.D.C. 2012)). And it is on that front where the parties disagree.

Plaintiffs assert they previously "sought comprehensive discovery on SAWS, including discovery that ought to have elicited documents about the 'restarted' SAWS program." (Mot. at 5.) PTO disagrees, insisting that Plaintiffs could have pursued "discovery beyond the SAWS program that PTO began in 1994 and ended in 2015" but chose not to, including by not moving to compel

6

discovery into other "review programs" over PTO's objections. (Opp'n at 14.) PTO additionally takes the position that Dr. Bragdon, during her deposition, referred to the review program Plaintiffs now characterize as a "restarted SAWS program," yet Plaintiffs "failed to ask Dr. Bragdon a single follow-up question about it." (*See id.* at 15.) On balance, the Court credits Plaintiffs' diligence during the discovery period and finds that PTO's contrary arguments miss the mark.

Most importantly, PTO steadfastly maintained throughout discovery that the SAWS program ended in 2015. That was true in PTO's court filings, in PTO's written discovery responses, and even in Dr. Bragdon's deposition testimony. (*See* ECF No. 77-1, Pls.' Ex. G (Bragdon Dep. Tr.) at 309 (testifying that the "SAWS program was shut down in 2015").) When it came to the lifespan of the SAWS program, PTO's position was unequivocal. So, while it may be true that Plaintiffs did not push harder for additional discovery into other secondary-review programs administered by PTO in the years after 2015, the reason seems clear: based on PTO's repeated representations, Plaintiffs had no reason to believe any other review programs were akin to SAWS.

Then came the public reporting on Ed Martin's letter. At that point, Plaintiffs discovered that a senior DOJ official—reportedly based on specific information he received from the then-Acting PTO Director—believed that PTO "restarted" the same prior SAWS program underlying Plaintiffs' claims. According to the letter, PTO began reengaging in "unconstitutional SAWS activity" in 2021, including by "secretly flag[ging] pending patents and allowable patent applications and claims to prevent them from issuing." (*See* Pls.' Ex. E; *see also* Pls.' Ex. F.) Plaintiffs never heard anything of the sort from PTO or its witnesses during discovery; PTO certainly does not suggest as much. Framed appropriately, then, Plaintiffs' request is comparable to those cases where courts have reopened discovery based on newly disclosed evidence. *2910 Georgia Ave. LLC v. Dist. of Columbia*, 312 F.R.D. 205, 209–11 (D.D.C. 2015); *see also G & E*

*Real Est., Inc. v. Avison Young–Washington, D.C., LLC*, 323 F.R.D. 67, 71 (D.D.C. 2017); *In re Rail Freight Fuel Surcharge Antitrust Litig.* (*Rail Freight I*), 281 F.R.D. 12, 14 (D.D.C. 2011). And viewed through that lens, the Court disagrees that Plaintiffs were not diligent in pursuing this information earlier when their basis for seeking additional discovery only surfaced after the close of discovery, especially given PTO's own discovery representations about the lifespan of SAWS.

*Prejudice*. This factor asks "whether the non-moving party would be prejudiced" by reopening discovery. *Rail Freight II*, 138 F. Supp. 3d at 2. PTO argues that it would be prejudiced by the prospect of additional delay, both as to the resolution of Plaintiffs' motion for class certification and the disposition of the case overall. (*See* Opp'n at 15–16.) But as Plaintiffs identify (Reply at 6), some delay, where a trial date is not set, is not particularly prejudicial. *Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC*, 776 F.3d 1, 5 (D.C. Cir. 2015) ("[D]elay that merely prolongs litigation 'is not a sufficient basis for establishing prejudice.'") (quoting *Berthelsen v. Kane*, 907 F.2d 617, 621 (6th Cir. 1990)); *see also Watt*, 840 F. Supp. 2d at 327 (identifying little prejudice based on "the mere passage of time") (citation omitted). More broadly, to the extent PTO is concerned about prejudice beyond delay—*i.e.*, prejudice from broader discovery (Opp'n at 16)—this can be addressed by allowing only limited and targeted discovery into the issues raised by the DOJ letter, as addressed below.

*Foreseeability*. The next factor considers "the foreseeability of the need for additional discovery in light of the time allotted by the district court." *Rail Freight II*, 138 F. Supp. 3d at 2. For the same reasons explained above, the Court agrees with Plaintiffs that the need for the additional discovery they seek was not foreseeable during the discovery period. PTO again argues that Plaintiffs should have foreseen the need to pursue details about other PTO review initiatives earlier, and PTO stresses that Plaintiffs could have (but did not) probe further with Dr. Bragdon

through deposition questions about the "large patent family review" program she referenced at one point. (Opp'n at 15.) But this again ignores the chasm between Dr. Bragdon's description of the program and Mr. Martin's description of that same program in his letter to the then-Acting PTO Director. Based on the information PTO now identifies, Plaintiffs could not have reasonably foreseen that another review initiative might be tantamount to a "restarted SAWS program," certainly not on the specific and provocative terms suggested by the DOJ letter, and certainly not in the face of PTO's steady insistence that the SAWS program was shut down for good in 2015.

*Relevance*. The final factor examines "the likelihood that the discovery will lead to relevant evidence." *Rail Freight II*, 138 F. Supp. 3d at 2. Unsurprisingly, the parties have widely divergent views on this subject. Plaintiffs say the DOJ letter itself provides the relevance hook for the additional discovery they seek. If PTO truly "restarted" the SAWS program in 2021, as Mr. Martin stated he was advised by the then-Acting PTO Director, then it becomes easy to understand why more discovery into the contours of that program would be relevant. For its part, PTO does not really argue on that terrain. Instead, PTO's relevance objections are premised on the notion that the program described in the DOJ letter was not, in fact, a "restarted" SAWS program, no matter what Mr. Martin might have meant. This explains why PTO submits a supplemental declaration from Dr. Bragdon that goes into some meaningful detail about both the review program that PTO contends was referenced in the DOJ letter and how that program differs substantially from the SAWS program that Plaintiffs challenge. (*See* Bragdon Decl.)

Taken at face value, Dr. Bragdon's declaration seems to go a long way toward undercutting Plaintiffs' theory. But Plaintiffs' theory is not something they conjured up on their own. Again, it traces its roots to a letter written by a senior DOJ official based on information reportedly conveyed by the then-Acting PTO Director. And that DOJ letter made some bold assertions. It described a

recently discontinued PTO program as a "restarted" SAWS program that was in effect between 2021 and 2025, connected that "restarted" program to the SAWS program that operated from 1994 to 2015, and characterized the program as "illegal" and comprising "unconstitutional SAWS activity." Perhaps the DOJ's "Weaponization Working Group" got out over its skis in the way it described the issue, and perhaps the letter's sensationalized characterizations of the relevant program are inaccurate. But against that backdrop, the Court is hard-pressed to reject Plaintiffs' relevance arguments out of hand. The Court agrees Plaintiffs should at least have an opportunity to probe the newly proffered details in Dr. Bragdon's supplemental declaration through a follow-up deposition. *See, e.g.*, *Pishevar v. Fusion GPS*, 2025 WL 885115, at \*5 (D.D.C. Mar. 21, 2025) (recognizing litigants' interest in probing their adversaries' representations in declarations, including by asking follow-up questions and identifying other potentially relevant context); *see also Davidowitz v. Patridge*, 2010 WL 1779279, at \*5 (S.D.N.Y. Apr. 23, 2010) (characterizing discovery as a "mechanism … to test the evidence of their opponents"). If, as PTO and Dr. Bragdon proffer, the DOJ letter was simply wrong in its representations, that ought to be the end of the matter. But given the unusual context through which this issue surfaced—formal correspondence between a high-level DOJ official and PTO leadership—Plaintiffs understandably want a chance to test whether there may yet be more to the story. Plaintiffs pass the relevance test.

*    *    *

On balance, with PTO opposing the request, all but one of the applicable "good cause" factors weigh toward reopening discovery into the subject of a potentially "restarted" SAWS program that may have been in effect beyond 2015. So, the Court believes that Plaintiffs' motion for additional discovery is warranted, at least in some sense. But that leaves the question of exactly what additional discovery the Court should greenlight. Plaintiffs do not propose any specifics—

10

whether in the form of additional written discovery or deposition discovery—except to request, "[a]t the very least," an additional deposition of "Dr. Bragdon regarding her new declaration to determine the scope of the … program." (Reply at 4.) In fact, that strikes the Court as a sensible starting point. Accordingly, the Court will allow Plaintiffs to conduct an additional deposition of Dr. Kathleen Bragdon, not to exceed three (3) hours, with questioning limited to the subject of the review program referenced in the DOJ letter, her new declaration, and any closely related issues.

## CONCLUSION AND ORDER

For the reasons stated, the Court **GRANTS** Plaintiffs' motion (ECF No. 77) to authorize an additional deposition of Dr. Bragdon, not to exceed three (3) hours, limited to the subject of the review program referenced in the DOJ letter, her new declaration, and any closely related issues. The parties should complete the deposition within thirty (30) days of this order absent mutual agreement or further order of the Court.

Thereafter, the parties should confer and file a joint status report within ten (10) days after the conclusion of that deposition, setting forth their respective positions on whether any additional discovery may be appropriate and on precisely what terms. In keeping with the existing referral, the undersigned stands ready, as necessary, to resolve any future disagreement between the parties. In the meantime, the Court will temporarily table any further consideration of Plaintiffs' motion for class certification based on the possibility that the parties might seek to supplement their submissions with additional information that may be uncovered through further discovery.

SO ORDERED.

Dated: March 17, 2026

MATTHEW J. SHARBAUGH
United States Magistrate Judge

11